IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 18, 2010

## STATE OF TENNESSEE v. MARCOS ACOSTA RAYMUNDO, a.k.a. MARCOS RAYMUNDO ACOSTA

**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2655      Cheryl Blackburn, Judge**

**No. M2009-00726-CCA-R3-CD - Filed November 10, 2010**

The Defendant, Marcos Acosta Raymundo, a.k.a. Marcos Raymundo Acosta, was charged with one count of aggravated child abuse of a child less than eight years old, a Class A felony, one count of aggravated child neglect of a child less than eight years old, a Class A felony, and two counts of child abuse of a child less than six years old, a Class D felony. See Tenn. Code Ann. §§ 39-15-401(a), -402(b).  Following a jury trial, he was convicted of four offenses: one count of attempted aggravated child abuse of a child less than eight years old, a Class B felony, and the other three offenses as charged.  He was sentenced as a Range I, standard offender to twelve years for count one, attempted aggravated child abuse, twenty-five years for count two, aggravated child neglect, four years for count three, child abuse, and four years for count four, child abuse.  The trial court ordered that count two was to be served concurrently with count one, and that counts three and four were to be served concurrently with each other, but consecutively to count two.  Thus, the trial court sentenced the Defendant to a total effective sentence of twenty-nine years in the Department of Correction. In this direct appeal, the Defendant contends that: (1) the State presented evidence insufficient to convict him; and (2) his convictions for counts one, two, and four violated the principles of double jeopardy.  After reviewing the record, we conclude that the State presented insufficient evidence to convict the Defendant of count two, aggravated child neglect, and that the Defendant's convictions for count one, attempted aggravated child abuse, and count four, child abuse, violate the principles of double jeopardy.  Thus, we reverse the Defendant's convictions on counts two and four, and affirm his convictions on counts one and three.  We remand to the trial court for a redetermination of concurrent and consecutive sentencing.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Remanded**

DAVID H. WELLES, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Paul J. Walwyn, Madison, Tennessee, for the appellant, Marcos Acosta Raymundo, a.k.a. Marcos Raymundo Acosta.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

This case arises out of allegations that the Defendant abused his girlfriend's three-year-old daughter, L.S.,[1] hereinafter referred to as the victim, between May 2007 and July 5, 2007. The Defendant was indicted and charged with one count of aggravated child abuse, one count of aggravated child neglect, and two counts of child abuse. The Defendant's trial was held November 3-6, 2008.

Trina Moss testified that she started dating the Defendant in September 2006 and that he lived with her from February 2007 to July 5, 2007. She said that her daughter, the victim, also lived with them during that time. Both Ms. Moss and the Defendant worked, and the victim was often cared for by various babysitters, including Mesha Russell, Ms. Moss's mother Pamela Sage, and Ms. Moss's brother and sister-in-law. At the end of May 2007, Ms. Moss stopped using Ms. Russell as the victim's primary babysitter. She stated that Ms. Russell brought some bruises on the victim to Ms. Moss's attention and that after discussing it with the Defendant, she decided not to have Ms. Russell watch the victim anymore. Ms. Russell had pointed out that the victim had two circular bruises on her stomach, one on her left cheek, and one on the right side of her forehead. Ms. Moss testified that the victim was clumsy and that she believed the bruises on the victim's face were from running into a car door and a bedroom door. At the time, she believed that the marks on the victim's stomach were from running into a dog gate at Ms. Sage's house. Ms. Moss later testified that Ms. Russell also pointed out that the victim had a bite mark on her upper arm. Ms. Moss stated that, while the Defendant and the victim were playing, she once saw the Defendant starting to bite the victim, but that she told him to stop. She recalled that he said he was "just kidding" and stopped. Ms. Moss said that was the only time she ever saw him exhibit any type of biting behavior.

---

[1] Out of respect for the privacy of the minor victim, we will identify her only by her initials.

Ms. Moss testified that she worked on July 5, 2007, and that her mother, Ms. Sage, watched the victim from approximately 7:15 a.m. to 1:30 p.m., while Ms. Moss was at work. She stated that she and the victim arrived back at their apartment about 1:45 p.m., and that they were alone until the Defendant returned home around 5:00 p.m. Ms. Moss testified that she did not do anything during that time to cause any injury to her daughter. She recalled that her friend, Yvonne Kirby, was going to dye Ms. Moss's hair and that Ms. Kirby arrived at her apartment around 5:30 p.m. so that they could go to Wal-Mart to get supplies. Ms. Moss testified that she was going to take the victim with her but that the Defendant said, "[L]eave [the victim] here so that I know you'll come back."[2] Ms. Moss complied with his request and left the victim at home with the Defendant, despite the fact that the victim was crying and did not want to stay with the Defendant. She testified that she and Ms. Kirby were only gone for approximately thirty minutes.

When they got back to Ms. Moss's apartment, the Defendant answered the door, carrying the victim in his arms. Ms. Moss recalled that the victim had vomit on her and that the Defendant had vomit on his chest. She also testified that the victim had vomited the previous day. Ms. Moss stated that, when she was cleaning up the victim, she noticed that the victim had several bruises on her body. She described that she saw three bruises on the victim's chest and that they looked like spaced-out fingerprints. She later explained that the victim had been playing with three children the night before and that she thought that was how the victim became bruised. She also stated that she saw a mark on the victim's upper right arm, which she later came to believe was a bite mark. Ms. Moss testified that she also saw a long bruise on the victim's cheek. She said that she first noticed the long bruise when she picked the victim up from her brother's house on July 1, 2007. She stated that she asked her brother if he knew where the victim obtained the bruise but that he said he did not know.

After Ms. Moss cleaned the victim, she gave her some Tylenol and let her watch a movie with Ms. Kirby's two children. Ms. Moss testified that the victim then fell asleep in Ms. Moss's room. She said that after Ms. Kirby left her apartment around 8:00 p.m., she took a shower. Ms. Moss recalled that she heard the victim cry while she was in the shower and, after she got out, she saw that the victim was sitting on the couch with the Defendant. Ms. Moss testified that she then left the apartment to get something to eat. She recalled that she asked the victim whether she wanted to come with her, but the victim said that she did not. She testified that approximately twenty-five minutes after she left, the Defendant called her on her cell phone and told her that she needed to get home because something was wrong with the victim. The Defendant told her that the victim was shaking, and Ms. Moss testified that, based on what she could hear through the phone, she could tell from a noise the victim

_____

[2] Ms. Moss testified that the Defendant spoke to her in Spanish and that she also spoke fluent Spanish.

-3-

was making that the victim's mouth was clamped shut. Ms. Moss testified that she was able to get home within five minutes of his call.

Ms. Moss stated that when she entered her apartment, the victim was on the couch and the Defendant was kneeling by her, putting rubbing alcohol on her stomach. Ms. Moss recalled that the victim's "hands were turned in, her knees were knot kneed, and . . . her toes were actually pointing inward and downward and her eyes were rolled back in the back of her head and her jaw was clamped shut." She also stated that the victim's head was shaking from left to right. She testified that it was immediately apparent that she needed to call 911, so she called and told them that she thought the victim might be having a seizure. The paramedics arrived within ten minutes, she recalled. Until just before the paramedics arrived, the victim was unresponsive to Ms. Moss's requests that her daughter "wake up." However, she said that shortly before the paramedics arrived, the victim opened her eyes, said "Mommy," and wrapped her arms around Ms. Moss's neck.

Ms. Moss testified that the paramedics put the victim in the ambulance and that she was also allowed to ride to Vanderbilt Children's Hospital with them. She recalled that the Defendant "said he didn't want to go to the hospital, but I told him he's coming to the hospital." She stated that her mother and stepfather brought the Defendant to the hospital with them. Describing what happened when Ms. Moss and the Defendant went into the victim's hospital room later, she testified, "[M]y little girl jumped up and screamed, no, and jumped into my mother's arm."

At the hospital, Ms. Moss spoke to Detective Sarah Bruner about her daughter's injuries. She testified that she told Detective Bruner that she did not know how her daughter received her injuries and that she did not remember the Defendant doing anything intentionally or accidentally to hurt the victim. However, when she was interviewed again a few weeks later, Ms. Moss told the detective that, on July 2 or July 3, 2007, she saw the Defendant "pop" the victim on her right upper thigh. She explained that a "pop" was when you heard a popping sound on the skin. Ms. Moss testified that immediately before the Defendant "popped" the victim on the right upper thigh, the victim was acting "fussy" and "kept crying."

Ms. Moss testified that, although the Defendant was not regularly alone with the victim, he was alone with her for two hours in May—approximately five to six days before Ms. Russell confronted Ms. Moss about the victim's bruises—and that, several times, he would be alone with her when Ms. Moss would leave to buy something to eat. Ms. Moss also testified that, on several occasions, the victim had cried when the Defendant came home from work. She described, "[W]hen she would hear his keys in the lock, she would come running to me and say, Marcos is home, no." Ms. Moss testified that, while the victim was

sick,[3] the Defendant once said, "[L]et [the victim] die so we can have children." However, she said that the Defendant later said he was "just kidding."

When asked whether she had previously done anything to injure her daughter, Ms. Moss testified that when she and the victim were in Blockbuster sometime between July 2 and July 4, 2007, the victim acted "real fussy" and had been screaming and crying for fifteen or twenty minutes. Ms. Moss admitted to grabbing the victim on her lower jaw and stated that she later saw a corresponding bruise on the victim's face. Ms. Moss testified that she was also charged with various offenses arising from the circumstances that led to her daughter's hospitalization. She stated that she pleaded guilty to child abuse and attempted child neglect and that she was in the State's custody at the time of the Defendant's trial.

Ms. Sage, the victim's maternal grandmother, testified that she babysat the victim on July 5, 2007, while Ms. Moss was at work. She recalled that Ms. Moss dropped the victim off at her house at approximately 6:30 a.m. and picked her up at about 2:30 p.m. Ms. Sage testified that she had taken care of the victim approximately five or six days per week since the end of May 2007.

Ms. Sage testified that, on the evening of July 5, 2007, Ms. Moss called to inform her that the victim needed to go to the hospital and asked Ms. Sage if she could pick up the Defendant and drive him to the hospital. Ms. Sage testified that she saw the victim at the hospital on the evening of July 5, 2007, and described that the victim "was beat to a pulp" and "had bruises and bite marks from the top of her head down to her feet." She stated that when the victim left her house on the afternoon of July 5, 2007, the victim did not have any noticeable injuries. She also testified that she would have seen marks on the victim's body because she saw the victim without her shirt on that day.

Ms. Sage recalled that she was in the victim's hospital room when Ms. Moss and the Defendant walked in. Ms. Sage stated that the victim screamed "and jumped out of the bed into my arms" when she saw the Defendant. She also testified that this was not the first time that she had witnessed the victim exhibit this type of behavior. Ms. Sage recalled that approximately two weeks before July 5, 2007, the Defendant was in the car when Ms. Moss came to pick up the victim from her house and that the victim did not want to get in the car. Ms. Sage testified that she had previously seen marks on the victim. She said that she first noticed a long bruise on the victim's face, running from her left ear to her chin, in June 2007. She also stated that she noticed marks on the victim's belly and arm in mid-June 2007. She said that she later learned that they were bite marks but that she did not realize it at the time.

---

[3] The record is not clear whether Ms. Moss meant the Defendant said this while the victim was in the hospital in July 2007, or whether he made the remark at a prior time when the victim was ill.

Yvonne Kirby testified that she was friends with Ms. Moss and that she went over to Ms. Moss's apartment on July 5, 2007, to dye her hair. She said that, after she picked Ms. Moss up, they went to Wal-Mart for about thirty minutes. Ms. Kirby testified that, when they returned to Ms. Moss's apartment, the Defendant was holding the victim, who was covered in vomit, and that the victim "was crying and shaking." She also stated that the Defendant seemed irritated that she was there and that he did not move from the couch the whole time she was at the apartment. Ms. Kirby testified that she dyed Ms. Moss's hair and that by the time she left the apartment, it was getting dark outside.

Ms. Russell testified that she babysat the victim from the end of November 2006 to the beginning of June 2007. Ms. Russell recalled that Ms. Moss typically worked on weekends during that time and that she would watch the victim continuously, including overnight, from Friday through Sunday or Monday. She stated that on the weekend of May 25, 2007, she noticed some bruises on the victim. Ms. Russell testified that she observed a large bruise on the victim's hairline, some small bruises on her face, a long bruise on her upper thigh, and a large circular bruise on her stomach. She stated that she mentioned the bruises twice to Ms. Moss, the second time expressing concern that the Defendant may have caused them. Ms. Russell testified that Ms. Moss subsequently stopped using her day care services.

Ms. Russell also testified that, a few weeks before she noticed the bruises, the victim started to act very frightened when Ms. Moss came to pick her up. She recalled that, at first, the victim said, "[N]o, no, no, I don't want to go home." Ms. Russell testified that the victim's protests got worse over time. She recalled that the last time Ms. Moss came to pick the victim up, the Defendant was in the car too. She stated that the victim did not want to leave Ms. Russell's house and even grabbed on to her house door while screaming that she did not want to go home.

Officer Ralph Fernandez, employed by the Metropolitan Nashville Police Department, testified that he speaks fluent Spanish and often assists other officers by translating for Hispanic witnesses. He stated that on the morning of July 6, 2007, he assisted Detective Bruner in her interview with the Defendant at Vanderbilt Children's Hospital. He said that the interview was recorded and that he reviewed the recording before testifying at the trial.

Regarding what transpired after Ms. Moss left the apartment to get food, Officer Fernandez testified as follows:

> He said after a few minutes, a few short minutes, he was sitting on the couch. [The victim] came out of the bedroom. And he believes that she

maybe wasn't feeling real good because she sat next to him and said her stomach was hurting.

. . . .

After that—he said after a few minutes, maybe about five minutes or ten minutes after [Ms. Moss] had left, he noticed as he looked at her that it looked like she was about to pass out on him.

. . . .

He said that it looked like she was trembling. She was starting to tremble.

. . . .

At that point he said that he had called [Ms. Moss], and he picked up [the victim]. At that point he went and got some rubbing alcohol and rubbed alcohol on her chest.[4]

Officer Fernandez later clarified that the Defendant said the victim's trembling started about ten minutes after Ms. Moss left. Officer Fernandez testified that the Defendant was asked about all of the injuries to the victim's body, but the Defendant "said that he knew nothing about it." Officer Fernandez also stated that the Defendant did not accuse Ms. Moss of causing the injuries at any point during the interview. However, he noted that the Defendant did admit to seeing bruises on the victim previously but blamed them on the babysitter.

Detective Sarah Bruner, with the Metropolitan Nashville Police Department, testified that she was a detective in the Youth Services Division. Detective Bruner stated that she was called to Vanderbilt Children's Hospital at about 2:00 a.m. or 3:00 a.m. on July 6, 2007, to investigate what happened to the victim. She testified that she observed the victim's injuries and began to photograph them. Detective Bruner recalled that she interviewed Ms. Moss, Ms. Sage, and the Defendant. She also stated that, after receiving Ms. Moss's consent, she went to Ms. Moss's home to look for evidence and take photographs.

Detective Bruner recalled that she took two sets of photographs of the victim's injuries. She first photographed the victim at around 7:00 a.m. on July 6, 2007, and took a second set around 4:00 p.m. because more bruises had appeared on the victim's body. She acknowledged that the lighting was different in the two sets of pictures because the first set was taken in the emergency room and the second set was taken in the pediatric intensive care unit. The photographs were introduced as evidence and viewed by the jury.

---

[4] Officer Fernandez also interjected that, in his experience, "some Hispanics use alcohol as a cure-all."

Detective Bruner stated that the victim remained at Vanderbilt Children's Hospital for four days and that after she was released, Detective Bruner arranged for a forensic dentist to examine some of the marks on the victim's body because she suspected they might be bite marks. She also testified that she had subpoenaed relevant phone records for July 5, 2007, and verified that the Defendant called Ms. Moss at 8:46 p.m. and that Ms. Moss called 911 at 8:52 p.m.

Detective Bruner testified that she interviewed the Defendant a second time on August 27, 2007, at the police station. She stated that Detective Marvin Rivera served as a translator for that interview.[5] She testified that the Defendant first stated that the victim probably hurt herself by playing with other children, or while she was being watched by the various babysitters. Detective Bruner recalled that the Defendant acknowledged making the statement that he wished the victim would die, but he claimed he was "just kidding." During the interview, the Defendant claimed that, when Ms. Moss was at Wal-Mart, he had thrown the victim in the air and that was what caused her to throw up. Later in the interview, the Defendant explained that he threw the victim in the air, let her fall, and that she fell on her toy stroller, causing the injuries to her stomach. He also stated that he had pushed her around in her toy stroller and that she had fallen out three or four times. At another time during the interview, he said he threw a ball at the victim several times.[6] Detective Bruner recalled that the Defendant "also admitted that he had pinched her cheek several times, that he had bit her on at least two occasions, and he did say that when he threw her up that that might have caused the bruises on her chest." Detective Bruner estimated that over the course of the second interview, the Defendant gave her ten different stories to explain how the victim was injured. Detective Bruner also recalled that the Defendant admitted to spanking the victim; however, he said it was not for disciplinary reasons and could not explain why he spanked her.

Dr. Michael Tabor, deemed an expert in the field of forensic odontology by the trial court, testified that he examined some of the victim's injuries. He testified that the injuries to her right shoulder and left arm were consistent with adult human bite injuries. He said that it was impossible that the victim's bite injuries were self-inflicted and that they were also inconsistent with "biting while playing." By examining the different colors of some of the victim's bruises and bite marks, Dr. Tabor concluded the bite marks were inflicted on different days than some of the victim's other injuries. He also opined that the two bite

---

[5] She also testified that Detective Rivera was not available to testify at the Defendant's trial because he was sick with the flu.

[6] It is not clear from the record whether the Defendant said he did all of these things while Ms. Moss was at Wal-Mart, or whether he did them while she went out to get food later in the evening.

marks, to her right shoulder and left arm, were made at different times. Dr. Tabor testified that the bite marks were consistent with non-accidental trauma.

Dr. Tyler Berutti, an assistant professor in pediatric critical care at Vanderbilt Medical Center, testified as an expert in the fields of pediatric medicine and pediatric critical care. He testified that he treated the victim after she had been transferred from the emergency department and into the pediatric intensive care unit. He stated that the victim was in critical condition when she first arrived in the emergency department.

Dr. Berutti testified that he observed a number of bruises on the victim's body:

> Most notably the ones I had documented in my note were a bruise to the left ear, she had some bruising to the face, a couple of bruises to the right of her sternum, one bruise to the le[f]t of her sternum, and some bruising on the back of her thighs. And then she had a round circular bruise, oval kind of shaped bruise, on the back of her right arm and one that appeared similar in nature to that one that was on the left scapula, which is the back of the—your left shoulder.

He also testified that he typically sees bruises on the shins and forearms of young children and that the victim's abnormal bruising patterns made him concerned about non-accidental trauma. Dr. Berutti recalled that, when he examined the victim, she had bruises that were not documented on the initial exam, and that led him "to believe that at least some of these bruises were very new." He specifically stated that bruises on the victim's lower back and jaw line appeared to be "relatively new," judging by the color of the bruises. Regarding a bruise on the victim's left ear, Dr. Berutti testified that he was concerned it was caused by non-accidental trauma because it would have taken "a decent amount of force" to inflict such an injury. He recalled that the victim had multiple bruises on her chest and that the injuries were inflicted "[c]ertainly within the last day."

Dr. Berutti also stated that the victim had multiple internal injuries. He said the victim had a bilateral pneumothoraces, that he explained was caused by a disruption to the membrane covering the lung, which could allow air into the space between the lung and chest wall. Dr. Berutti testified that the victim had air in her mediastinum, the space between the lungs and heart, which is called pneumomediastinum, and that she also had air around her heart, referred to as pneumopericardium. He testified that these types of internal "injuries are seen in accidents that are generated by a lot of force like a motor vehicle accident." He stated that he might expect to see these types of injuries in other "high impact type accidents" such as getting hit by a car, getting hit very hard playing football, falling from the second story of a building, or getting thrown off of a bicycle. Dr. Berutti testified that he thought

an adult could have inflicted the victim's injuries by hitting her with a fist or foot. He testified that he did not think a child could obtain such internal injuries by tripping, by falling off a bed, or by being hit in the chest with a ball. He opined that her internal injuries were "very recent" and that they were not consistent with trauma that happened weeks, or even days, before her hospital admission.

Dr. Berutti said that the victim's condition was "very serious" and said that, with the injuries she had, doctors were concerned that both of her lungs could collapse, causing respiratory arrest, and that air would compress her heart, causing cardiac arrest. He testified that the victim was admitted to the critical care unit for close observation and that it could only take "seconds to minutes" for the victim's condition to worsen. Dr. Berutti stated that if the victim had not been presented to the hospital, "she certainly would have the potential to progress to either a respiratory or cardiac arrest." Dr. Berutti also testified that "[t]here was concern for a duodenal hematoma," which is a bruise to the first part of the small intestine, and that there was evidence of injury to the victim's liver and pancreas. He said that, in his opinion, the victim suffered some direct trauma to her liver and spleen. Dr. Berutti also opined that it was a separate trauma that caused injury to the victim's lungs.

Regarding the onset of symptoms when a child has a pneumothoraces and a pneumopericardium, Dr. Berutti testified that the signs—such as increased respiratory rate, potentially increased difficulty of breathing, and shortness of breath—would be visible within minutes. He said that he would also expect to see abdominal discomfort, leading to vomiting, with abdominal injuries. Dr. Berutti also testified that he had never seen a case where a child had serious internal injuries from trauma but did not have any external bruising. Dr. Berutti testified that it was "very important" for the victim to receive immediate medical care with the type of traumatic injuries she sustained. The prosecutor asked, "In your opinion, Doctor, did the fact that [the victim did] not get medical attention shortly after she received these injuries cause her ultimate collapse that precipitated the 911 call?" Dr. Berutti responded, "Yes."

The State made the following election of offenses:

> Count One of the Indictment alleges an act of aggravated child abuse against [the victim], and refers to the following conduct: the [D]efendant caused internal trauma to [the victim] involving pneumothoraces, pneumopericardium and pneumomediastinum, air surrounding her internal organs, on July 5, 2007.

> Count Two of the Indictment alleges an act of aggravated child neglect against [the victim], and refers to the following conduct: the [D]efendant

-10-

delayed seeking medical treatment for [the victim] after causing internal injuries to her, resulting in her condition worsening to the point where she ultimately collapsed and had to be admitted to the pediatric intensive care unit in critical condition for observation and [sic] on July 5, 2007.

Count Three of the Indictment alleges an act of child abuse against [the victim], and refers to the following conduct: the [D]efendant caused multiple bite injuries to [the victim] between May 2007 and July 4, 2007.

Count Four of the Indictment alleges an act of child abuse against [the victim], and refers to the following conduct: the [D]efendant caused multiple bruises to [the victim] on or about July 5, 2007.

The Defendant testified in his own defense.[7] He stated that when Ms. Moss would take the victim to a babysitter, she often would come back with bruises. He testified that many different people would babysit the victim, including his mother, his sister-in-law, Ms. Moss's mother, Ms. Moss's friends, and Ms. Moss's ex-sister-in-law.

When asked whether he had ever bitten the victim, he said, "I tried to but [Ms. Moss] told me not to." He then said that he was not trying to bite the victim, rather only pressing down with his lips. However, on cross examination, he admitted that he had tried to bite her and that they were not playing at the time. He testified that he gave the detectives more information during the second interview than the first interview because they "were pressuring me to say things."

The Defendant maintained that on July 5, 2007, he came home from work around 5:00 p.m. He testified that Ms. Moss and her friend were going to go to Wal-Mart and that he asked her to leave the victim home "so that she would come back quickly." He elaborated, "I had just gotten back from work, and I didn't have a car. I needed to buy something to eat." He testified that he did not do anything to make the victim vomit while Ms. Moss was at Wal-Mart. He said that the victim was playing, and he was watching TV right before she vomited.

He testified that while Ms. Moss was gone to get them something to eat, he was playing with the victim with a little stroller and a ball. He said that she fell out of the stroller a couple of times while they were playing but that she would just get back in it so they could play some more. The Defendant claimed that when they were playing with the ball, he threw

[7] Because the Defendant was not fluent in English, interpreters simultaneously translated the court proceedings for him. They also translated his testimony for the jury.

-11-

it softly at her. He later also said that he lifted her up in the air and suspended her but that she never fell while he was doing this. The Defendant said that after they had been playing, the victim sat down in the chair in which he was sitting and started to faint. He recalled, "And then I held her to see what was wrong, and she started to shake. And then I called [Ms. Moss]. And then I went to the bathroom with her in my arms to get some alcohol to put it on her chest." When asked why he did not call 911 himself, the Defendant said, "Because I didn't know how to explain myself of what was happening to the girl." He claimed that he told Ms. Moss "to hurry up so that she could see the child and to—so that she could call the ambulance."

The Defendant testified that at the time he called Ms. Moss, he was worried because the victim "was really trembling." He said that after the ambulance arrived and Ms. Moss prepared to go to the hospital with her daughter, Ms. Moss "asked me if I would go with her, but her car didn't have enough gasoline." He claimed that because the car did not have enough gas, he asked Ms. Moss to call Ms. Sage so she could drive him. The Defendant testified that when he went with Ms. Moss into the victim's hospital room, she did not jump into anybody's arms, like Ms. Sage had claimed, and that she had machines attached to her.

When asked whether he wished the victim would die, he said "[n]ot really" and that his comment to Ms. Moss was made "jokingly." He claimed he made the comment before summer and described the circumstances surrounding his comment as: "That day [Ms. Moss] had said to me that—asking if we were going to have another child. And I said that with [the victim] it was enough. I said to her jokingly the only way we would have another child is if [the victim] died. Playing."

Miriam Areli Otero, the Defendant's sister-in-law, testified that she babysat the victim on June 25, 2007. She recalled that the victim was dirty and that her clothes smelled, so she bathed her. While she was giving the victim a bath, Ms. Otero saw bruises on the victim's back, stomach, and leg. She also testified that she saw the victim on July 4, 2007, and that the victim had bruises on her face. When shown pictures of the victim's bruises taken when she was in the hospital on July 6, 2007, Ms. Otero testified that the bruises she had previously seen on the victim's back, stomach, leg, and face were in the same places as some of the bruises represented in the pictures. She testified that Ms. Moss was a bad mother but that the Defendant "was normal" toward the victim.

On November 6, 2008, the jury convicted the Defendant of one count of attempted aggravated child abuse, a lesser included offense of aggravated child abuse, one count of aggravated child neglect, and two counts of child abuse. On January 7, 2009, the trial court sentenced the Defendant to twelve years for count one (attempted aggravated child abuse), twenty-five years for count two (aggravated child neglect), four years for count three (child

abuse), and four years for count four (child abuse). The trial court ordered that count two was to be served concurrently with count one and that counts three and four were to be served concurrently with each other, but consecutively to count two. Thus, the trial sentenced the Defendant to a total effective sentence of twenty-nine years in the Department of Correction. He now appeals.

## Analysis

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to convict him.[8] Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

---

[8] It is unclear whether the Defendant is challenging his conviction for all four counts or just the aggravated child neglect conviction. His brief does give the statutory elements for all four convictions but only discusses, in one paragraph, aggravated child neglect. However, we will address the sufficiency of the evidence for all four of the Defendant's convictions.

At the time of the offense, the relevant child abuse and neglect statute stated as follows:

> (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is six (6) years of age or less, the penalty is a Class D felony.
> (b) Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class E felony.

Tenn. Code Ann. § 39-15-401(a)-(b) (2006). The relevant aggravated child abuse and aggravated child neglect statute stated as follows:

> (a) A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment, who commits the offense of child abuse, as defined in § 39-15-401(a), or who commits the offense of child neglect or endangerment, as defined in § 39-15-401(b), and:
> (1) The act of abuse or neglect results in serious bodily injury to the child.

Tenn. Code Ann. § 39-15-402(a)(1) (2006). "'Serious bodily injury' means bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34).

Our supreme court has held that child abuse is a "nature-of-conduct" offense and that, "[a]s such, the prosecution need not prove that the defendant 'intended' to cause injury to the child." State v. Toliver, 117 S.W.3d 216, 230 (Tenn. 2003). However, the State must show that the Defendant was "aware of the nature of the conduct" when he treated the victim "in such a manner as to inflict injury." Tenn. Code Ann. §§ 39-11-302(b), -15-401(a); State v. Hanson, 279 S.W.3d 265, 277 (Tenn. 2009). Our supreme court has also instructed "that before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." State v. Mateyko, 53 S.W.3d 666, 671-72 (Tenn. 2001). Finally, because the Defendant was convicted of attempted aggravated child abuse, we note that our criminal attempt statute states as follows:

-14-

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3), unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

Tenn. Code Ann. § 39-12-101.

## A. Attempted Aggravated Child Abuse

The State elected that count one of the indictment, aggravated child abuse, referred "to the following conduct: the [D]efendant caused internal trauma to [the victim] involving pneumothoraces, pneumopericardium and pneumomediastinum, air surrounding her internal organs, on July 5, 2007."

The evidence presented at trial showed that the Defendant was alone with the victim two times on the evening of July 5, 2007—around 5:30 p.m. for about thirty minutes while Ms. Moss went to Wal-Mart and also later in the evening, for about thirty minutes, when Ms. Moss went to get something to eat. When Ms. Moss returned home the second time, she immediately called 911 because the victim was lying on the couch with her head shaking from left to right, her eyes rolled in the back of her head, and her jaw clamped shut.

Dr. Berutti testified that when the three-year-old victim presented to Vanderbilt Children's Hospital on July 5, 2007, in critical condition, she was diagnosed with a bilateral pneumothoraces (a disruption to the membrane covering the lung, which could allow air into the space between the lung and chest wall), pneumomediastinum (air in the space between her lungs and heart), and pneumopericardium (air around her heart). He stated that he believed her injuries were "very recent" and that the types of internal injuries she had were

generated by a lot of force. He testified that he thought an adult could have inflicted the victim's injuries by hitting her with a fist or foot. He classified the victim's injuries as non-accidental trauma. Dr. Berutti also testified that the victim's injuries were very serious and that he was concerned she might experience respiratory or cardiac arrest.

The jury also heard testimony that the Defendant was interviewed twice by Detective Bruner. The first time, conducted at the hospital on July 6, 2007, the Defendant claimed that he did not know anything about the victim's injuries. The second time, conducted at the police station on August 27, 2007, the Defendant gave several different explanations for how the victim could have been injured. Among the stories he told was that he threw the victim in the air and that she fell onto her toy stroller, that he pushed the victim around in her toy stroller and that she fell out three or four times, and that he threw a ball at the victim several times. The Defendant testified at trial and acknowledged that he said to Ms. Moss "jokingly the only way we would have another child is if [the victim] died. Playing." After a thorough review of the evidence, we conclude that the jury had sufficient evidence to find that the Defendant committed attempted aggravated child abuse beyond a reasonable doubt. This issue is without merit.

### B. Aggravated Child Neglect
The State elected that count two of the indictment referred to the following conduct: "[T]he [D]efendant delayed seeking medical treatment for [the victim] after causing internal injuries to her, resulting in her condition worsening to the point where she ultimately collapsed and had to be admitted to the pediatric intensive care unit in critical condition for observation and [sic] on July 5, 2007." Although the Defendant mentions the other three convictions in his brief, he only presents an argument to support his assertion with regard to the conviction of aggravated child neglect. He contends that the State did not present proof that demonstrated the act of neglect caused serious bodily injury to the victim.

The Tennessee Supreme Court has held that the "mere risk of harm" is insufficient to prove child neglect. State v. Mateyko, 53 S.W.3d 666, 671 (Tenn. 2001). Moreover, "before a conviction for child neglect may be sustained, the State must show that the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." Id. at 671-72. In State v. Denise Wiggins, we found sufficient evidence to support the State's claim that the defendant burned her five-year-old daughter with an iron and, thus, affirmed the defendant's conviction for aggravated child abuse. No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *4 (Tenn. Crim. App., Jackson, Nov. 2, 2007). The State had also charged Wiggins with aggravated child neglect because she failed to seek medical attention for her daughter after she inflicted the burn. Id. at *5. This Court held, however, that there was insufficient evidence to convict the defendant of aggravated child neglect because "[t]he

proof at trial fail[ed] to demonstrate that it was the act of neglect, or failure to seek medical treatment, which *resulted* in serious bodily injury." Id.

Similarly, in State v. Vernita Freeman, we upheld the defendant's conviction for aggravated child abuse; however, we found that insufficient evidence was presented to support her conviction for aggravated child neglect. No. W2005-02904-CCA-R3-CD, 2007 WL 426710, at *1 (Tenn. Crim. App., Jackson, Feb. 6, 2007). We noted that a doctor testifying at the defendant's trial said that the victim "might have survived" if she received prompt medical treatment. Id. at *8 n.1. However, we concluded that "the proof does not demonstrate that it was the act of neglect which caused the serious bodily injury. Rather, the proof established that it was the Appellant's acts of abuse which produced the serious bodily injury to the minor victim." Id. at *8; see also State v. Janet Huffine Dykes, No. E2001-01722-CCA-R3-CD, 2002 WL 1974147, at *7 (Tenn. Crim. App., Knoxville, Aug. 16, 2002) (reversing the defendant's conviction for aggravated child abuse through neglect because "there [was] no proof from which a rational jury could conclude that the delay—that is, the neglect—caused serious bodily injury as required by the statute").

In State v. John Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772 (Tenn. Crim. App., Jackson, Apr. 26, 2010), this Court was presented with a case similar to the instant case. The defendant in Barlow was convicted of aggravated child abuse and aggravated child neglect. Id. at *1. The two-year-old victim suffered a skull fracture and severe head injury. Id. Barlow testified that he thought something was wrong with the victim at around 2:20 a.m., when he noticed her body felt "limp." Id. at *6. However, he did not leave to take her to the hospital until approximately 3:30 a.m. Id. The State argued that Barlow's delay in obtaining medical attention for the victim worsened her brain injury because it allowed her brain to continue to swell. Id. at *11. During Barlow's trial, the victim's surgeon testified that he thought "the victim's 'course would have been worse' because 'she would have had more swelling.'" Id. at *2. This Court noted that the surgeon "immediately added, '[Y]ou never know what difference it would make.'" Id. The surgeon also testified, "I can never tell how much difference it makes how quickly [the injured child gets medical treatment]—but the quicker the better." Id. at *3. We upheld Barlow's conviction for aggravated child abuse, noting that he was the only adult present at the time of the victim's injuries. Id. at *9. However, we vacated Barlow's conviction for aggravated child neglect because we found that the State "did not establish that Barlow's delay in seeking medical treatment had an 'actual, deleterious effect' on the victim's health. Instead, the evidence showed that Barlow's initial act of abuse caused serious bodily injury to the victim." Id. at *11.

We must agree with the analysis set forth in the cases discussed above and will examine the instant case in a similar fashion. Ms. Moss testified that, on the evening of July

-17-

5, 2007, she left the victim at home with the Defendant while she went to out to get something to eat. She testified that when she had been out about twenty-five minutes, the Defendant called her and told her to come home because something was wrong with the victim. She stated that she was able to get home within five minutes and that, when she walked into her apartment, she saw the victim on the couch, with the Defendant kneeling by her, putting rubbing alcohol on her stomach. Ms. Moss recalled that the victim's "hands were turned in, her knees were knot kneed, and . . . her toes were actually pointing inward and downward and her eyes were rolled back in the back of her head and her jaw was clamped shut." She also stated that the victim's head was shaking from left to right. She testified that it was immediately apparent to her that she needed to call 911. Phone records verified that the Defendant called Ms. Moss at 8:46 p.m. and that Ms. Moss called 911 at 8:52 p.m. During the trial, the Defendant testified that, when he called Ms. Moss, he was worried about the victim because she "was really trembling." However, the Defendant stated that he did not call 911 "[b]ecause I didn't know how to explain myself of what was happening to the girl."

It appears that the State attempted to distinguish count one, the initial abuse causing the victim's internal injuries, from count two, the delay in seeking medical treatment, in its election by referencing the victim's "collapse," as if it was an entirely new injury. However, after a thorough review of the record, we cannot conclude that the evidence supports such a factual finding. Dr. Berutti did not mention the victim's "collapse," besides answering only "Yes" to the following question posed by the prosecutor: "In your opinion, Doctor, did the fact that [the victim] not get medical attention shortly after she received these injuries cause her ultimate collapse that precipitated the 911 call?" There is nothing else in the record that supports the proposition that the victim "collapsed" from other causes besides the act of abuse that caused the victim's internal injuries. Dr. Berutti's testimony, however, does indicate that there was *risk* of further harm if the victim had not received prompt medical attention. He stated that if the victim had not been presented to the hospital, "she certainly would have the potential to progress to either a respiratory or cardiac arrest." However, "a mere risk of harm in the neglect context is . . . insufficient." Mateyko, 53 S.W.3d at 671-72. In our view, the State failed to show that the Defendant's delay in obtaining medical attention for the victim had an "actual, deleterious effect" on the victim's health. Therefore, the judgment of conviction for aggravated child neglect must be reversed, and that charge must be dismissed.

### C. Child Abuse—Bite Injuries

The State elected that count three of the indictment, child abuse, referred "to the following conduct: the [D]efendant caused multiple bite injuries to [the victim] between May 2007 and July 4, 2007."

Ms. Moss testified that, before she stopped using her daycare services in May 2007, Ms. Russell pointed out that the victim had a bite mark on her upper arm. Ms. Moss testified that she once saw the Defendant start to bite the victim while they were playing. She testified that he said he was "just kidding" and stopped. Detective Bruner testified that, during their second interview, the Defendant admitted to biting the victim on at least two occasions. Dr. Tabor, an expert in the field of forensic odontology, testified that he examined the victim and found that injuries on her left arm and right shoulder were consistent with adult human bite injuries. He stated that the marks on the victim's body were not self-inflicted, nor were they consistent with "biting while playing." Dr. Tabor testified that the bite marks were consistent with non-accidental trauma. He further opined that the bite marks were inflicted on different days than some of the victim's other injuries. Finally, the Defendant gave inconsistent testimony regarding whether he had bitten the victim. First, he testified that he "tried to but [Ms. Moss] told me not to." Then, he said that he was not trying to bite the victim, but rather only pressed down with his lips. Later, he admitted that he had tried to bite her and that they were not playing at the time. After reviewing the evidence, we conclude that the State presented sufficient evidence for a reasonable trier of fact to conclude, beyond a reasonable doubt, that the Defendant knowingly inflicted injury on the victim by biting her. Thus, the Defendant's conviction for count three, child abuse, is affirmed. This issue has no merit.

### D. Child Abuse—Multiple Bruises

The State elected that count four of the indictment, child abuse, referred "to the following conduct: the [D]efendant caused multiple bruises to [the victim] on or about July 5, 2007."

Ms. Sage testified that she babysat the victim until about 2:30 p.m. on July 5, 2007. She recalled that she saw the victim without her shirt on that day and that the victim had no noticeable injuries. Ms. Moss testified that when she was cleaning the victim after she came home from Wal-Mart, at approximately 6:00 p.m., after the Defendant had been alone with the victim for about thirty minutes, she noticed several bruises on the victim that she had not seen before—three bruises on the victim's chest and a mark on the victim's upper right arm. Ms. Moss testified that she witnessed the Defendant "pop" the victim on the upper right thigh on July 2 or July 3, 2007. Dr. Berutti testified that he observed a number of bruises on the victim's body, including bruises on her left ear, face, lower back, and back of her thighs. He testified that, when he examined the victim, she had bruises that were not documented on the initial exam, and that led him "to believe that at least some of these bruises were very new." He testified that he was concerned that the bruises were a result of non-accidental trauma. Moreover, the jury saw photographs taken by Detective Bruner that showed that the victim also had bruises in the middle of her back, on her right side, lower right arm, and right buttocks. After reviewing the evidence, we conclude that the State presented sufficient evidence for a reasonable trier of fact to conclude, beyond a reasonable doubt, that the

Defendant knowingly inflicted injury on the victim, causing her bruises. This issue has no merit.

## II. Double Jeopardy

The Defendant also alleges that counts one (attempted aggravated child abuse for the internal injuries), two (aggravated child neglect for the delay in obtaining medical assistance), and four (child abuse for the multiple bruises) all charge him with the same crime. He contends that his three convictions violate the principles of double jeopardy and only one conviction should stand. Although the Defendant did not raise this issue in the trial court, and only devotes three sentences of argument to this issue in his brief, we may address this issue on its merits if we find plain error.

Rule 36(b) of the Tennessee Rules of Appellate Procedure provides that "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." We apply a five-factor test to determine whether there is plain error:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is 'necessary to do substantial justice.'

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

In the instant case, the record clearly establishes that the Defendant was convicted of both attempted aggravated child abuse for inflicting the victim's internal injuries and child abuse for inflicting multiple bruises. As to the second and third factors, we conclude that if the Defendant's double jeopardy protections were violated, a substantial right of the Defendant was affected. See Adkisson, 899 S.W.2d at 639 (noting that "[a] 'substantial right' is a right of 'fundamental proportions in the indictment process, a right to the proof of every element of the offense, and is constitutional in nature'") (footnotes omitted); see also State v. Epps, 989 S.W.2d 742, 745 (Tenn. Crim. App. 1998) (applying the plain error doctrine to review whether the defendant's convictions for both theft and attempted theft violated the principles of double jeopardy). Regarding the fourth factor, we see no indication that the Defendant waived the issue for tactical reasons. Finally, under the fifth factor, we conclude that consideration of a double jeopardy violation is necessary to do substantial justice. Accordingly, we will review this issue as plain error. Having already determined that there was insufficient evidence to convict the Defendant of count two, aggravated child

neglect, we will only examine whether convictions on both count one, attempted aggravated child abuse, and count four, child abuse, violate the principles of double jeopardy.

As our supreme court has explained, "three fundamental principles underlie double jeopardy: (1) protection against a second prosecution after an acquittal; (2) protection against a second prosecution after conviction; and (3) protection against multiple punishments for the same offense." State v. Denton, 938 S.W.2d 373, 378 (Tenn. 1996) (footnote omitted). It is the third of these protections that the Defendant contends is being violated. In order for multiple convictions to stand, "it must be clear that the offenses are wholly separate and distinct." State v. Goins, 705 S.W.2d 648, 650 (Tenn. 1986) (citations omitted). If we find that multiple convictions cannot stand, the proper remedy for such situations is a merger of the two convictions into one by vacating the conviction on the lesser offense. State v. Zirkle, 910 S.W.2d 874, 889 (Tenn. Crim. App. 1995). Initially, we note that Tennessee's constitutional protection against double jeopardy has been construed to be greater than that offered by the federal Constitution. See Denton, 938 S.W.2d at 378-81; State v. Hayes, 7 S.W.3d 52, 55 (Tenn. Crim. App. 1999).

In Denton, our supreme court stated:

[R]esolution of a double jeopardy punishment issue under the Tennessee Constitution requires the following: (1) a Blockburger[9] analysis of the statutory offenses; (2) an analysis, guided by the principles of Duchac,[10] of the evidence used to prove the offenses; (3) a consideration of whether there were multiple victims or discrete acts; and (4) a comparison of the purposes of the respective statutes. None of these steps is determinative; rather the results of each must be weighed and considered in relation to each other.

938 S.W.2d at 381 (footnotes added). The subject offenses must first survive the federal Blockburger test in order to satisfy the requirements of the federal Double Jeopardy Clause. State v. Hayes, 7 S.W.3d 52, 55 (Tenn. Crim. App. 1999). If the offenses are the "same" under Blockburger, the federal constitutional double jeopardy protections have been violated and the inquiry may end. Id. Under the Blockburger test, two offenses are not the "same" for double jeopardy purposes if each "requires proof of an additional fact which the other does not." Blockburger, 284 U.S. at 304.

At the time of the offense, the child abuse statute stated as follows:

---

[9] Blockburger v. United States, 284 U.S. 299 (1932).

[10] Duchac v. State, 505 S.W.2d 237 (1973).

(a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is six (6) years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a) (2006). The aggravated child abuse statute stated: "(a) A person commits the offense of aggravated child abuse or aggravated child neglect or endangerment, who commits the offense of child abuse, as defined in § 39-15-401(a) . . . and: (1) The act of abuse or neglect results in serious bodily injury to the child." Tenn. Code Ann. § 39-15-402(a)(1) (2006). Thus, the aggravated child abuse statute required all of the elements of the child abuse statute plus a result of serious bodily. The lesser included offense of child abuse did not require any additional proof beyond that which was required for a conviction of aggravated child abuse. "The greater offense is therefore by definition the 'same' for purposes of double jeopardy as any lesser offense included in it." Brown v. Ohio, 432 U.S. 161, 168 (1977) (applying the Blockburger test and determining that joyriding was a lesser included offense of auto theft and that they were the "same" offenses for the purposes of double jeopardy); see Hayes, 7 S.W.3d at 55-56 ("An offense encompassed in total within another offense—what we call a 'lesser included offense'—does not require proof of an additional fact, and it is therefore considered the same offense and barred by double jeopardy."). In this case, we need not proceed further with the Denton test because we determine that child abuse and attempted aggravated child abuse are considered the same offense and barred by double jeopardy when the convictions refer to the same instance of conduct.

In our view, the dual convictions punish the Defendant twice for the same offense—once for causing the victim's internal injuries and then again for causing the bruising on her chest, which would have accompanied, and been inflicted at the same time as, the internal injuries. The State elected that the first count referred to the victim's internal injuries—the pneumothoraces, pneumopericardium, and pneumomediastinum—inflicted on July 5, 2007. During his testimony, Dr. Berutti discussed the victim's serious internal injuries and also stated that he had never seen a case where a child had serious internal injuries from trauma but did not have any external bruising. The State elected that the fourth count referred to the "multiple bruises" inflicted on the victim "on or about July 5, 2007." As discussed above, the State presented evidence, via testimony and photographs, that the victim had about two dozen bruises on her body. Ms. Moss testified that she saw three bruises on the victim's chest when she came home from Wal-Mart around 6:00 p.m. on July 5, 2007. Dr. Berutti testified that he observed a number of bruises on the victim's body, including bruises on her left ear, face, lower back, and back of her thighs. He also noted that he saw bruises on her chest that were inflicted within the last day. Detective Bruner's

photographs showed that the victim also had bruises in the middle of her back, on her right side, lower right arm, and right buttocks. Had the State specified in its election that the "multiple bruises" did not refer to any of the bruises on the victim's chest, we could conclude that the jury did not convict the Defendant twice for inflicting those injuries—once under count one and once under four. However, because the State's election did not separate the conduct supporting each count, we cannot ascertain that the jury convicted the Defendant for "wholly separate and distinct" offenses. Because of double jeopardy prohibitions, we are required to vacate the conviction in count four and to merge the two convictions into a single conviction for attempted aggravated child abuse.

### Conclusion

Based on the foregoing authorities and reasoning, we conclude that the State presented insufficient evidence to convict the Defendant of count two, aggravated child neglect. We also conclude that the Defendant's convictions for both count one, attempted aggravated child abuse, and count four, child abuse, violate the principles of double jeopardy. Thus, we conclude that the conviction on count four must be vacated and merged into the conviction on count one. We affirm his convictions on counts one and three. We remand to the trial court to allow the trial court to consider whether the sentences for count one and count three should be served concurrently or consecutively.

_____
DAVID H. WELLES, JUDGE